Filed 3/26/21  In re K.H. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re K.H. et al., Persons Coming Under the Juvenile Court Law. | C090979 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Q.H.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD238927, JD239247) |

Q.H., mother of the minors K.H. and L.H., appeals from the juvenile court's order terminating her parental rights and making the minors available for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  Mother contends the juvenile court improperly placed the minors with foster caretakers rather than J.A., a non-related extended family member.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

She also contends the juvenile court erred in finding the beneficial parental relationship exception to adoption did not apply. We will affirm the juvenile court's orders.

BACKGROUND

In July 2016, the San Joaquin County Human Services Agency (Agency) filed a dependency petition on behalf of the minor K.H., then 13 months old, pursuant to section 300, subdivision (b), alleging the following: mother and the father C.D. engaged in ongoing domestic violence in the minor's presence; the parents had a history of engaging in conflicts and physical altercations with related and unrelated individuals; mother was referred to Valley Mountain Regional Center (VMRC) due to a childhood traumatic brain injury but failed to avail herself of those services; both parents suffered from untreated mental health issues that placed the minor at risk; that father was referred to VMRC for a psychological evaluation and other treatments but failed to avail himself of those services; father had a history of substance abuse from which he failed or refused to rehabilitate; the parents failed to ensure the health and safety needs of the minor; the parents had a history of housing instability; and the parents had an open voluntary maintenance case plan from September 2015 through June 2016 but failed to follow through with the provisions of their plan. The minor was detained on July 7, 2016 and placed in a foster home.

The juvenile court sustained the allegations in the petition and ordered the minor removed from the parents' custody, and further ordered reunification services to mother, including anger management, general counseling, psychotropic medication evaluation and monitoring, psychiatric/psychological evaluation, and parenting education. Mother completed all aspects of her case plan. However, according to the psychological evaluation completed by Dr. Cavanaugh, who diagnosed mother with a traumatic brain injury, mild cognitive impairment, and a mild organic personality disorder with impulsivity and difficulty modulating anger, mother continued to demonstrate concerning behaviors, including a physical altercation with a man at a bus stop whom mother became

2

angry with and bit on the face. There were also issues following overnight visits when mother returned K.H. to the foster parent dirty, tired, and in a soiled diaper.

Mother gave birth to a second child, L.H., in 2017 and disclosed feeling depressed but refused any medication. She moved to Sacramento to be closer to the maternal grandfather. Despite the Agency's existing concerns, the minor was returned to mother under a plan of family maintenance and, in February 2018, the case was transferred to Sacramento County.

On August 20, 2018, the Sacramento County Department of Child, Family, and Adult Services (Department) filed a supplemental petition on behalf of K.H. (then three years old) pursuant to section 387 alleging mother failed to provide adequate care, supervision, and protection for K.H. due to mother's continued engagement in domestic violence and her exposure of K.H. to unsafe situations. It was alleged that mother engaged in a physical altercation with her friend C., and with her roommate L. and L.'s 17-year-old daughter, who mother punched in the face while the minors K.H. and L.H. were present. It was also alleged that mother allowed two male friends to engage in a physical altercation in her home in the minors' presence.

That same day, the Department also filed a petition on behalf of L.H. (then one year old) pursuant to section 300, subdivision (b) based on the same allegations as those stated in the section 387 petition filed on behalf of K.H.

The minors were placed together in a confidential foster home pursuant to a protective custody order and, on August 22, 2018, were detained pursuant to the order of the juvenile court.

According to the September 2018 jurisdiction/disposition report, mother admitted the minors were present during multiple incidents of violence between her and other individuals and that, during one incident in which mother was punched in the face, mother was holding L.H. in her arms. Mother stated she had been diagnosed with Bipolar Disorder and depression for which she was prescribed several medications, but

3

she had not pursued any mental health services or medication since prior to K.H.'s birth. Mother stated she would like to be reevaluated for psychotropic medication because she believed it helped with her depression and anger.

Mother requested placement of the minors with the maternal grandfather or his former girlfriend J.A., a non-related extended family member. The social worker reported that, in August 2018, she spoke with J.A., who said that although she was often referred to as the minors' maternal grandmother and had been in a romantic relationship with the maternal grandfather, she never married the maternal grandfather and was "of no blood relation to the children." The report provided an assessment of J.A. as a non-related extended family member indicating she did not meet section 309 emergency placement standards due to multiple child protective service investigations and was referred to a Resource Family Approval (RFA) orientation. J.A. elected to be approved through Atkinson's Foster Family Agency (FFA) and was awaiting assignment of an FFA/RFA social worker.

Noting mother had already received over 24 months of various services aimed at addressing the reasons for the juvenile court's intervention, the Department reported mother failed to utilize the available tools effectively to prevent further incidents of violence in the minors' presence. With a prospective adoptive family reportedly willing to provide permanency in the form of adoption, the Department recommended that the juvenile court sustain the allegations in the section 387 petition and terminate mother's parental rights as to K.H. With respect to L.H., the Department recommended that the juvenile court sustain the allegations in the section 300 petition, remove L.H. from mother's custody, and bifurcate its dispositional findings as to L.H. based on potential applicability of section 361.5, subdivision (b)(2) to bypass services to mother due to challenges posed by her cognitive delay and her inability to safely keep L.H. in her care.

The initial hearing as to K.H. and the jurisdiction/disposition hearing as to L.H. were scheduled to commence on September 13, 2018, but were continued. At that time,

4

J.A. informed the juvenile court that her previously ordered visits with K.H. had yet to commence and requested she be provided with visits and be considered for placement of the minors. The juvenile court ordered that the Department facilitate visitation between J.A. and the minors and provide an update on the RFA status for J.A. at the next hearing.

The October 2018 addendum report stated J.A. was referred to RFA orientation on August 28, 2018, but chose to complete her RFA assessment through Atkinson's Family Services Foster Agency. J.A. and her husband submitted an RFA application to the assigned FFA/RFA social worker, Cheryl Bright, with whom they completed their first interview. Bright reported the second interview was scheduled, and she anticipated the final assessment would be completed by mid-November 2018. Bright also reported there was a delay in processing J.A.'s application due to the fact that J.A. submitted her application using a different last name and did not inform the agency that she was interested in RFA approval due to a specific need for placement. Bright noted that, if J.A. had so indicated, the agency would have prioritized her assessment accordingly. In addition, Bright stated J.A. first contacted the agency in April 2018 to be assessed for general placement of the minors but never submitted the intake paperwork, leaving the agency with the impression that she had lost interest in becoming a resource family. J.A. contacted Bright again in August 2018 to reengage in the process but did not state there was a specific placement need for the minors she wished to have placed with her. J.A. submitted the intake paperwork at the end of August 2018 but was asked to resubmit the documentation due to incomplete or improperly completed fields. Bright also indicated that although J.A. submitted to a background check, the background check had been delayed and remained pending. Bright noted however, that throughout the process, J.A. had been responsive and there were no concerns to report.

The foster mother reported that visits between J.A. and the minors were going well. The social worker reported that J.A. admitted her relationship with L.H. was not as bonded as her relationship with K.H., who reportedly responded positively to J.A. during

5

visits. J.A. stated that while she would have liked to take both minors, she and her husband were only willing to provide care and permanency for K.H., as they already had other children to care for and were planning to adopt another boy in the future, and she did not want to force her husband into a situation where they could not adequately manage the minors due to demanding work schedules and the schedules and needs of the other children already in their care. J.A. reiterated that she could not manage the care of L.H., an infant, at the time and could not commit to placement or permanency for L.H. The social worker noted J.A.'s husband reluctantly confirmed his interest in providing placement or permanency for K.H. but was clear he was not willing to do so for L.H. The foster mother reported concerns about whether J.A. and her husband could manage the minors' needs based on the fact that J.A. repeatedly requested weekend visitation due to her inflexible work schedule.

J.A. reported she was present during the violent incident between mother and mother's former roommate and was aware of mother's history of aggression and violence which J.A. attributed to mother's brain injury. J.A. stated mother required ongoing care and oversight by formal and informal supports (e.g., Alta Regional Center) and it was clear that mother could only care for one minor at a time.

As part of its RFA assessment, the Department identified two concerns regarding placement of K.H. with J.A. First, J.A. and her husband indicated they worked full-time and would require childcare assistance from the Department in order to provide care for K.H.; otherwise, they would not have the means to provide daycare for K.H. on their own. Second, the Department noted that J.A.'s pending criminal history included three inconclusive or unfounded prior referrals involving allegations of domestic violence with J.A.'s former husband, physical abuse by J.A.'s former husband, and physical abuse by J.A. as recently as 2017.

The November 2018 addendum report stated RFA/FFA social worker Bright was continuing to work on finalizing the RFA assessment for J.A. and her husband, but noted

6

J.A. continued to refuse placement of both minors and, even if she were amenable to having both minors, she would have to apply for a documented alternative plan (DAP) due to not having the appropriate number of bedrooms to gender and age ratio in the home. It was also reported by the foster mother that the minors, particularly K.H., had regressed in their sleeping and were having frequent tantrums and displays of aggressive behaviors by biting, hitting, kicking, and spitting which necessitated regular calls for intervention during daycare. The minors reportedly screamed when dropped off for visits with family and sometimes refused to eat after visits. Given the minors' many needs, and the fact that J.A. and her husband had inflexible schedules and did not believe the minors had many needs, the Department was not confident J.A. and her husband would be able to manage the minors. On the other hand, the current foster parents remained consistent in their desire that both minors remain placed in their home and were willing to provide permanency for both.

The Department reported that K.H. and L.H. had a close bond and experienced anxiety and difficulty sleeping when separated. They appeared to seek out each other for comfort in new environments. While J.A.'s RFA assessment was still pending, the Department did not recommend placement of the minors with J.A. due in large part to the fact that the minors could not be placed together in J.A.'s home and breaking or hindering the bond between the two minors would not be in their best interest.

The December 2018 addendum report confirmed J.A. and her husband received RFA approval for placement on December 7, 2018; however, while J.A. stated she had the flexibility to adjust her work schedule to meet the medical, mental health, and educational needs of her children, she and her husband were still requesting placement of K.H. only. After some discussion, J.A. and the Department agreed to delay authorization of placement until further dispositional orders were made and to provide J.A. with additional time to bond with L.H. through frequent visitation and then reassess whether she and her husband could provide permanency to both minors.

7

At the jurisdictional hearing, mother waived her rights and submitted to the allegations in both petitions. On February 7, 2019, the juvenile court accepted mother's waivers, sustained the allegations in the petitions, and found the minors to be dependents of the juvenile court. The juvenile court denied reunification services to mother, set the K.H. matter for a section 366.26 hearing, and ordered disposition continued in the L.H. matter to allow mother to participate in a psychological evaluation to determine her ability to benefit from services.

According to the March 2019 relative placement hearing report, RFA/FFA social worker Bright reported that while J.A.'s home was certified for one child, she would have to recertify the home for two children because J.A. had recently communicated her decision to have both minors placed in her home. As of March 19, 2019, J.A.'s RFA recertification for two children was still pending as FFA social worker Bright was out of the office for a substantial period of time and unable to return to further assess the feasibility of adding two children to J.A.'s home.

In the meantime, the social worker reported receiving a telephone call from mother who was upset because she had just had a personal dispute with J.A. regarding mother having redesignated assignment of her supplemental security income (SSI) benefits from the maternal grandfather to mother's best friend despite their previous agreement that J.A. would be an additional payee along with the maternal grandfather. Mother reported that J.A. was extremely upset, would no longer help mother by taking placement of both minors, and would instead continue to pursue placement of K.H. only. When social worker Bright followed up with J.A. regarding the disagreement, J.A. said, "[E]verything is fine," but continued to have reservations about taking both minors and stated the family was looking to provide a permanent home to K.H. only.

Permanency social worker Daniel Bodon expressed reservations about placing the minors with J.A. after receiving numerous concerns from the foster parents and K.H.'s therapist, Dr. Jennifer Bob, indicating K.H. had deteriorated since having contact with

8

J.A.  Bodon stated he was present, along with therapist Dr. Jennifer Bob, during a visit in which K.H. was initially cheery and talkative but immediately shut down once J.A.'s name was mentioned, turning her body completely away from all parties and refusing to speak for the rest of the session.  Dr. Jennifer Bob also reported that K.H. had exhibited more aggressive behavior and cursing after having unsupervised visits with J.A.  Dr. Bob commended the foster parents on their patience and appropriate response to the minors' needs, and noted the foster parents were "well-equipped and very open to support the children in whatever way they can."

Therapist Dr. Jennifer Bob also noted a concerning incident during a January 2019 supervised visit when K.H. wet herself while sitting on mother's lap.  Mother became upset, took K.H. to the restroom, and attempted to force K.H. to lie down on the changing table.  When K.H. resisted, she sustained scratches on her neck from mother attempting to force her down.  K.H. continued to flail and eventually kicked mother, causing mother to become more upset.  Mother grabbed K.H.'s foot and bit her toes, causing K.H. to scream.

Social worker Bodon also reported that L.H. was taken for x-rays of her arm after the foster parents noted limited mobility.  L.H. was diagnosed with a dislocated left elbow and decreased range of motion in her left wrist.  The foster parents did not know when or where the injury occurred but stated L.H.'s limited mobility was noted when L.H. was initially placed in their home and it was possible the injuries pre-dated L.H.'s removal from mother's care.

The April 2019 addendum report indicated J.A. and her husband eventually received RFA approval for temporary placement of both minors on March 27, 2019, with such approval set to expire on December 7, 2019.  Nevertheless, the Department concluded it would not be in the minors' best interests to place them in the home of J.A. due to the fact that J.A. and her husband had not expressed a consistent and confident desire to have both minors placed in their care.  For example, when J.A. affirmed her

9

willingness to take custody of both minors, she stated immediately thereafter that she had spoken with the maternal grandfather, who was interested in placement of L.H., and proposed that she keep K.H. while L.H. stayed in the care of the maternal grandfather. It was noted that the maternal grandfather had not contacted the Department to communicate his interest in placement and the Department's previous efforts to contact him did not reveal any interest. The Department also relied on the report of therapist Dr. Jennifer Bob, who noted that while the cause of K.H.'s increased aggressive behaviors was unknown, there was a clear correlation between K.H.'s mental and behavioral condition worsening and the initiation of unsupervised visits with J.A. in December 2018. Dr. Bob noted K.H. had shown an overall regression since those unsupervised visits began and was not progressing in therapy as a result of the regression and increased behavioral issues.

The Department reported that the minors had been placed in their foster home since August 2018 and both the Department and therapist Dr. Jennifer Bob assessed that the minors appeared comfortable, well-adjusted, and well cared for by their foster parents, who had been committed to providing permanency for both minors since the first day of placement. The minors appeared bonded to their caregivers and there were no reported issues or concerns of abuse or neglect.

On April 11, 2019, the juvenile court granted the foster parents' request for de facto parent status as to both minors. At mother's request, the juvenile court scheduled a contested relative placement hearing.

The June 2019 selection and implementation report stated mother requested, on September 7, 2018, that her twice-weekly supervised visits with the minors be changed to once-weekly for two hours. Mother was on time and appropriate for the majority of the visits. However, during several visits, K.H. would not follow mother's directions and would lash out aggressively towards mother. There were many incidents of hitting, biting, and spitting by K.H. toward mother which required intervention by the visitation

10

supervisor. There were also many times when mother became frustrated with K.H.'s failure to follow directions and acts of aggression which caused mother to become upset and lash back at K.H. by raising her voice, biting the child on the foot, or giving up. Mother reportedly lacked the necessary skills to appropriately parent K.H. and often required intervention.

K.H. was reportedly making good developmental progress in the home of the de facto parents. The de facto parents, the therapist, and school officials all reported improvement in her behaviors. K.H. sought her caregivers out for comfort and responded well to them. The de facto parents attributed K.H.'s progress to the recent added supervision of, and reduction of, visits with J.A. The therapist credited the de facto parents with their involvement in K.H.'s therapy and with practicing learned skills in the home.

The Department said K.H. was generally adoptable, recommended the minor not be placed with J.A., and further recommended that the juvenile court terminate mother's parental rights with a permanent plan of adoption by the current caregivers.

According to the fifth addendum report, mother's psychological evaluation was completed by Dr. Cynthia J. Neuman, Ph.D., who stated mother had an organic brain syndrome characterized by verbal deficits and poor emotional control. Dr. Neuman diagnosed mother with major neurocognitive disorder due to her earlier traumatic brain injury, with intellectual decline and behavioral disturbance. Dr. Neuman assessed that mother was incapable of making meaningful changes in her behavioral responses through services despite her earnest efforts and therefore there were no services available that would allow mother to develop the parenting skills necessary within the allocated six-month period.

Therapist Dr. Jennifer Bob reported that, since beginning weekly outpatient treatment in October 2018, K.H. made significant gains in her ability to tolerate frustration, use her words in place of aggressive behaviors, and regulate. The de facto

11

parents were consistent in attending scheduled sessions and Dr. Bob indicated that much of K.H.'s progress was the result of the de facto parents' continued involvement in the minor's therapy.

K.H.'s behaviors during visits with J.A. had reportedly greatly improved since transitioning to supervised visits. It was also reported that when supervised visits occurred, L.H. cried during the transition to the visit and tried to leave the visitation area to look for the de facto parents. Supervised visits between J.A. and the minors were reportedly appropriate. J.A. was affectionate with the minors and redirected their negative behaviors, and the minors referred to J.A. as "mom" or "mommy." However, L.H. struggled during the transition and cried for her foster mother who she also called "mommy." K.H. still exhibited some challenging behaviors in her foster home and was referred to Alta Regional Center for services to assess her behaviors.

According to the sixth addendum report, mother's second psychological evaluation was completed by Dr. Anthony Urquiza, Ph.D., who diagnosed mother with major neurocognitive disorder due to her traumatic brain injury, mild behavioral disturbance (e.g., mood disturbance, aggression), and an unspecified personality disorder. Dr. Urquiza noted that mother's deficits became more apparent the longer he interviewed her. He assessed mother's ability to meaningfully engage in and benefit from parenting/reunification services as very poor due to her cognitive deficits, pattern of mental health problems, and persistent pattern of angry outbursts and mood dysregulation. Like Dr. Neuman, Dr. Urquiza concluded it was not reasonable for mother to benefit from services within the six-month timeframe, and any effort to change her behavior in order to render her a safe and adequate parent would entail a substantially longer period of time and would still likely be unsuccessful.

The Department concluded that L.H. was adoptable and recommended that the juvenile court remove the minor from mother and terminate mother's parental rights.

The seventh addendum report, filed September 9, 2019, stated mother was in the process of being evaluated by Alta Regional Center; however, Alta Regional Center was awaiting records from VMRC. Mother reportedly completed her parenting education class and her anger management class and had demonstrated her ability to recognize the importance of assessing her anger prior to losing control to avoid situations that escalate into violence. Mother also demonstrated the ability to understand how resolving situations using the conflict resolution model was helpful in controlling escalation of her anger. Mother's case manager, Chris Woodard, reported that mother's memory challenges were of significant concern, but he worked with mother to maintain a journal to remember appointments and other important events. Mother was reportedly taking her psychotropic medications as directed and was being assessed every 90 days. The Department recommended that the juvenile court order L.H. removed from mother and that it set the matter for a section 366.26 hearing.

The contested placement hearing as to both minors commenced on September 20, 2019 and was completed on October 15, 2019. At both the contested placement hearing and the contested disposition hearing, social workers Patricia Holden, Daniel Boden, and Cheryl Bright testified, as did the de facto parents and J.A.

On October 15, 2019, with respect to L.H.'s disposition, the juvenile court adjudged L.H. a dependent of the court and set the matter for a section 366.26 hearing as to L.H. With respect to relative placement, the juvenile court denied the request for placement with the non-related extended family member and ordered the minors placed with the de facto parents. In doing so, the juvenile court focused on the best interests of the minors, noting J.A.'s reluctance to take both minors into her home, the issues and concerns raised by therapist Dr. Jennifer Bob regarding K.H.'s regression and behavioral changes following unsupervised visits with J.A., and the fact that the de facto parents to whom the minors were bonded had been committed to permanency for both minors since August 2018 and had been proactive with the minors' mental health needs.

13

On October 31, 2019, determining that none of the exceptions to adoption had been raised and "if they were raised they would not apply," the juvenile court terminated mother's parental rights as to K.H. and identified adoption as the permanent plan.

Mother filed a timely appeal of the juvenile court's October 15, 2019 and October 31, 2019 orders.

## DISCUSSION

### I

Mother contends the juvenile court abused its discretion when it denied her request to place the minors with J.A. and instead placed them with the de facto parents. She claims the juvenile court erred when it gave J.A. no placement preference consideration. She further claims the Department wrongly denied J.A. her right to immediate placement in August 2018 while J.A.'s home was pending RFA approval. Finally, she claims it was not in the minors' best interests to place them in the home of the de facto parents where there was evidence of possible medical neglect and abuse.

As we shall explain, mother lacks standing to assert her challenges, but in any event, the juvenile court did not abuse its discretion in placing the minors with the de facto parents.

Although the parties did not assert or brief the issue of standing, justiciability is present in every case (see *Save Laurel Way v. City of Redwood* City (2017) 14 Cal.App.5th 1005, 1015, fn. 9), and the issue of standing is fairly included within mother's argument that the juvenile court erred in placing the minors with the de facto parents rather than J.A., the non-related extended family member. (See Gov. Code, § 68081; *People v. Alice* (2007) 41 Cal.4th 668, 678-679 [the parties need not be afforded an opportunity to present their views through supplemental briefing when the issue is inherent in the claim presented].)

Standing to raise a particular issue on appeal depends on whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v.*

*Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035 (*Cesar V.*); accord *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) A person does not have standing to urge errors on appeal that affect only the interests of others. (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877.) Accordingly, a parent is precluded from raising issues on appeal that do not affect his or her own rights. (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806.)

In dependency proceedings, a parent's interest is in reunification and in maintaining a parent-child relationship. (See *In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541.) While reunification efforts are ongoing, parents generally have standing on appeal to raise issues concerning relative placement. This is because one of the rationales for placing children with relatives is that, during reunification, "[a] relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child." (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493.)

On the other hand, when reunification is no longer being pursued, a parent is not aggrieved by placement determinations. Thus, the court in *Cesar V.* held that "a parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated. [(*Cesar, supra*, 91 Cal.App.4th at p. 1035.)] This is because decisions concerning placement of the child do not affect the parent's interest in reunification, where the parent is no longer able to reunify with the child." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499; see *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 435-436.)

Here, the juvenile court denied reunification services to mother in the K.H. matter on February 7, 2019, well prior to the October 15, 2019 placement hearing. In the L.H. matter, the juvenile court bypassed mother for services on October 15, 2019, and thereafter made its placement determination regarding the contested placement hearing. Thus, mother had no interest in the possible future placement of the minors with the non-

15

related extended family member. Having failed to establish that her rights and interests are injuriously affected by the placement of the minors with the de facto parents, mother lacks standing to raise the alleged error on appeal.

Exceptions to the general rule regarding a parent's standing exist when the placement may affect the decision whether to terminate parental rights. (See *In re H.G.* (2006) 146 Cal.App.4th 1; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042.) Such is not the case here. While mother's parental rights have not been terminated as to L.H., the minor's placement does not affect mother's interest in reunification, as the juvenile court bypassed mother's reunification services pursuant to section 361.5, subdivision (b)(2) based, in large part, on the two psychological evaluations of mother, both of which concluded that despite mother's earnest efforts, there were no services available to mother that would allow her to develop the necessary parenting skills within the statutory reunification period. Thus, the record makes plain that the juvenile court would have bypassed services and set the matter for a section 366.26 hearing regardless of whether L.H. (or for that matter K.H.) were placed with the non-related extended family member or the de facto parents. The juvenile court ordered L.H. to remain in the care of the de facto parents and selected adoption as the appropriate permanent plan. Thus, "the minor's placement did not have the potential to alter the juvenile court's determination regarding the appropriate permanent plan . . . or otherwise affect mother's interest in her legal status with respect to the minor." (*In re J.Y.* (2018) 30 Cal.App.5th 712, 718.)

Mother has not established that her legal rights or interests have been injuriously affected by the placement order and therefore she lacks standing to contest the order on appeal.

In any event, the juvenile court did not abuse its discretion in ordering placement of the minors with the de facto parents. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) Although preferential consideration is

given to relatives when determining where to place a child removed from the physical custody of his or her parents, a "relative" is defined as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship." (§ 361.3, subds. (a), (c)(2); see also § 319, subd. (h)(2).) Here, J.A. never married the maternal grandfather and was "of no blood relation to the children," and thus did not meet the statutory definition of a relative as set forth in section 361.3. It is undisputed that J.A. met the definition of a non-relative extended family member as defined in section 362.7 and was assessed as such, but she did not meet RFA emergency placement standards as set forth in section 309 due to multiple child protective service investigations. As a result, she was referred to an RFA orientation for non-emergency assessment in late-August 2018. Meanwhile, the juvenile court ordered the minors removed and placed in the care, custody, and control of the Department, who placed both children with the now de facto parents pursuant to section 361.2, subdivision (e).

Throughout the assessment process, J.A. and her husband were only interested in placement of one of the minors, K.H. The desire for placement of only one of the minors was consistent throughout the RFA process, raising concerns with the social workers and K.H.'s therapist, Dr. Jennifer Bob, that it would not be in the bonded minors' best interests to place them separately. J.A. eventually received temporary approval for placement of both minors in late-March 2019 (to expire in December 2019); however, serious concerns remained due to the fact that J.A. and her husband had reservations about taking both minors and had not expressed a consistent or confident desire to have both children placed in their home. There were additional concerns expressed by the de facto parents, the social workers, and therapist Dr. Jennifer Bob that K.H. deteriorated after unsupervised visits with J.A., had shown an overall regression since those visits began, and was not progressing in therapy due to the regression and increased behavioral issues.

17

On the other hand, the minors had been placed with the de facto parents since August 2018 and were comfortable, well cared for, and well-adjusted. The minors were bonded to, and sought comfort from, the de facto parents, who remained committed to providing permanency for both minors throughout the entire process. The juvenile court appropriately found that, "considering the totality of the circumstances," it was in the minors' best interests to be placed with the de facto parents.

Thus, even if mother had standing to raise her claim, the juvenile court's denial of placement with the non-related extended family member was not arbitrary, capricious, or patently absurd. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) The fact that evidence could be viewed more favorably to the proposed placement does not justify overturning the juvenile court's order. (*Id.* at p. 319.)

II

Mother also contends the juvenile court erred in finding the beneficial parental relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply. She claims a plan of legal guardianship would have been more appropriate. Having failed to assert this exception in the juvenile court, she has forfeited the issue on appeal.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368, original italics.)

The juvenile court has no sua sponte duty to determine whether an exception to adoption applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Rather, the parent has the burden of affirmatively raising and proving that an exception applies. (*Ibid.*; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809; *In re C.F.* (2011) 193 Cal.App.4th 549, 553; Cal. Rules of Court, rule 5.725(d)(2).)

18

Here, mother was present with counsel at the selection and implementation hearing.  Counsel objected to "all of the recommended findings and orders, including finding [K.H.] to be likely to be adoptable and to the recommendation to terminate parental rights."  However, there was no mention of the applicability of the beneficial parental relationship exception, the bond between mother and the minor, or any detriment that would incur from termination of mother's parental rights, nor is there anything in the record that can be said to constitute an effort to place the beneficial parental relationship exception at issue.  Thus, mother has forfeited her claim by failing to assert it in the juvenile court.  (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291-292; *In re Erik P.* (2002) 104 Cal.App.4th 395, 403; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502; *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.)

The fact that the juvenile court made the oral finding that termination was in the minor's best interest and would not be detrimental to the minor, or that the Department's reports included information regarding the history of contact between mother and the minor, does not excuse mother's forfeiture of her claim.  The issue was not asserted in the juvenile court.  It was mother's burden to prove one of the exceptions to adoption applied and, as the juvenile court stated, "There are only six statutory exceptions that allow an exception to adoption.  No party has raised those exceptions, and it does not appear that they would be applicable."  Mother's failure to raise the exception prevented the Department and K.H. from having a full and fair opportunity to present evidence and litigate the issue at the hearing.  We will not consider the challenge when the Department and the minor were not provided a fair opportunity to present an adequate record on the issue.  (See *People v. Adam* (1969) 1 Cal.App.3d 486, 489.)

Mother asserts the juvenile court should have opted for a permanent plan of legal guardianship.  We reject the assertion, as she fails to explain why the juvenile court should have ignored the statutory preference for adoption where, as here, the minors were found to be adoptable.

19

# DISPOSITION

The juvenile court's orders are affirmed.

_____/S/_____
MAURO, J.

We concur:

_____/S/_____
HULL, Acting P. J.

_____/S/_____
MURRAY, J.